**VISA, U.S.A., INC., Appellant,**

v.

**BIRMINGHAM TRUST NATIONAL BANK, Appellee.**

**No. 82–547.**

United States Court of Appeals, Federal Circuit.

Dec. 29, 1982.

John P. Sutton, San Francisco, Cal., argued for appellant. With him on the brief was Limbach, Limbach & Sutton, San Francisco, Cal.

Thad G. Long, Birmingham, Ala., argued for appellee. With him on the brief were Haydn M. Trechsel and Bradley, Arant, Rose & White, Birmingham, Ala.

Before FRIEDMAN, BALDWIN and NIES, Circuit Judges.

FRIEDMAN, Circuit Judge.

This appeal challenges decisions of the Patent and Trademark Office Trademark Trial and Appeal Board (the Board), 212 U.S.P.Q. 115 (1981), in a consolidated proceeding involving applications by each party for registration of the mark "O.K." in various forms used in connection with check cashing services. As explained herein, the determinative issue in each case depends upon the validity of the assignment by which the appellant acquired the rights in the mark from its former owner. The Board held the assignment invalid on the ground that it constituted a naked assignment of the mark without the transfer of the goodwill to which the mark related. We reverse.

I.

A. On September 20, 1976, the appellant, VISA U.S.A., INC. (Visa),[1] applied to the Patent and Trademark Office to register on the principal register the service mark "O.K."[2] for "the services of providing check cashing privileges by means of a card." On September 23, 1976, appellee Birmingham Trust National Bank (Birmingham Trust) filed applications to regis-

---

1. At that time, Visa was named National Bank-Americard, Incorporated. We shall refer to this company as "Visa."

2. The specimens of use show the mark OK, and the Board has stated that amendment should be required.

ter two similar marks ("Check-OK" and "OK" with a checkmark in the "O") for "banking services." The record established that the marks were used for Birmingham Trust's own check cashing card program. Visa and Birmingham Trust each filed an opposition to the respective applications. The Board consolidated the opposition proceedings.

Birmingham Trust had first used the mark on May 3, 1976. Alpha Beta Company ("Alpha Beta"), which later assigned the mark to Visa, had first used the mark on June 13, 1970.[3] Visa first used the mark in November 1976, on Visa "Check-O.K." cards. The assignment was made on September 10, 1976, and Visa claims that as the assignee of Alpha Beta, it could assert priority based upon Alpha Beta's earlier date of use. Under this theory, Visa's use of the mark preceded the use of Birmingham Trust by almost 6 years. Birmingham Trust's response was that the assignment of the mark from Alpha Beta to Visa was invalid because it did not also transfer Alpha Beta's goodwill associated with the mark.

B. The facts relating to the use and assignment of the mark are not in dispute. Alpha Beta, a chain of grocery stores in California and Arizona, first used the "Check-O.K." mark in 1970 to identify a program in which it provided its customers with cards that authorized Alpha Beta cashiers to accept personal checks. In order to obtain a card, a customer had to provide the store with certain credit information. Each card could be used only at the particular store where it was issued. Alpha Beta advertised the "Check-O.K." program as a way of making grocery shopping more convenient for those using checks. It used the "Check-O.K." mark continuously through September 1976. It issued cards to more than 1.5 million customers.

Birmingham Trust initiated its "Check-O.K." program in May 1976. Birmingham Trust customers received cards displaying the mark that enabled them to pay with personal checks for merchandise purchased at the stores of participating merchants (or to obtain cash with such checks). Birmingham Trust guarantied payment of any check for up to $100 accepted in reliance upon a valid guaranty card. Birmingham Trust operated the program throughout the Birmingham, Alabama, area.

Visa is a membership corporation composed of a large number of banks and financial institutions. For a number of years, it has issued a well-known credit card. In 1976, Visa decided to enter the check guaranty card business on a nationwide basis under the "Check-O.K." mark. Visa searched for other uses of the mark and found that Alpha Beta had registered it in California. At that time, Birmingham Trust was just beginning its program and had not registered the mark in Alabama or elsewhere.

On September 10, 1976, Alpha Beta and Visa executed three documents:

1. Alpha Beta and Visa entered into a contract by which Alpha Beta undertook to transfer its mark to Visa for $10,000. The agreement recited that Visa desired "to acquire the Mark and the goodwill symbolized thereby for use in connection with a national check approval program to be administered by [Visa] among its member financial institutions."

2. Alpha Beta assigned to Visa "all rights, title and interest in and to the said mark, all variations thereof, and designs thereof, together with the goodwill of the business symbolized by the mark and any variations thereof, the registration(s) thereof, and all causes of action for past infringement."

3. Visa and Alpha Beta entered into a license agreement under which Visa gave Alpha Beta "a non-exclusive, non-transferable license to use the Mark in connection with check approval services for [Alpha Beta's] customers." The agreement provid-

---

3. The parties had various versions of the mark. The parties agreed that despite these differences the use of the various marks would be confusing. We use the term "Check-O.K." to refer to all the variations.

ed that Alpha Beta would use the mark "only in the design" set forth on Alpha Beta's card, a copy of which was an exhibit to the agreement, and that the mark would not be displayed on store windows or doors. Alpha Beta agreed that "the nature and quality of all services rendered in connection with the Mark shall conform to standards set by, and under the control of, [Visa]" and that it would comply with three specified "minimum standards." The agreement authorized Alpha Beta to grant nontransferable sublicenses to Alpha Beta's parent company and to any of the latter's "wholly owned subsidiaries engaged in retail merchandising."

Following these transactions, Visa initiated its own check guaranty program under the "Check-O.K." mark in November 1976. The program was similar to that of Birmingham Trust, but was offered nationwide by various banks affiliated with Visa. Each participating bank operates the program locally in much the same way that Birmingham Trust runs its program. Visa's affiliated banks have issued more than 3 million cards with the mark under check guaranty programs. Visa controls the quality of the services its affiliates provide under the mark.

Under the license from Visa, Alpha Beta has continued to operate its check approval program under the "Check-O.K." mark much as it did before the assignment and license-back agreement. It operates the program, however, only in its Arizona stores, which comprise only about 5 percent of its total stores. The record does not explain why Alpha Beta no longer conducts the program in its California stores.

C. The Board awarded priority of use of the mark to Birmingham Trust and refused registration to Visa. It therefore dismissed Visa's opposition and sustained Birmingham Trust's opposition.

The Board stated that

an agreement which purports to assign a mark and the goodwill of the business which it symbolizes, whether made with or without a transfer of tangible or intangible assets, is not valid unless the assignee carries on the business of the assignor by using the mark in connection with goods or services which are the same as or substantially similar to those upon which the mark was used by the assignor.

It held that the assignment in this case did not satisfy that standard because the services Alpha Beta and Visa provided under the mark

are substantially different in nature. The Visa service involves a check guarantee, so that a merchant can cash a card-holding customer's check without hesitation, whereas the Alpha Beta service does not; the Alpha Beta service is available to holders of the Alpha Beta "OK" cards only at Alpha Beta stores, whereas the Visa service is available to holders of Visa "OK" cards at a large variety of participating retail stores; the Alpha Beta program involves only Alpha Beta and its customers, whereas the Visa program involves Visa's member banks, participating merchants, and those customers of the merchant who hold Visa "OK" cards issued by Visa's member banks; and the Alpha Beta service is directed to card-holding Alpha Beta customers, whereas the Visa service is directed both to merchants and to those of their customers who hold Visa "OK" cards.

The Board stated:

Under the "license back", Alpha Beta remains free to use the "OK" design mark in connection with its service in the same form as before, and Alpha Beta continues to benefit from the goodwill of the business which was symbolized by the mark prior to the purported assignment. Indeed, it appears from the record that, except for the fact that it has given up control over the mark, the only change in Alpha Beta's position since the date of the purported assignment and the "license back" has been that its use has been limited, for reasons unknown to this record, to Alpha Beta's 15 stores in Arizona, despite the fact that the bulk of Alpha Beta's stores are located in California.

The Board concluded that "the circumstances surrounding the purported assignment lead us to conclude that there was, in fact, no real transfer of goodwill" and that the assignment "was in essence a transfer [of the mark] in gross and, hence, invalid under Section 10 of the Trademark Act [15 U.S.C. 1060 (1976)]."

## II.

■ A. Unlike patents or copyrights, trademarks are not separate property rights. They are integral and inseparable elements of the goodwill of the business or services to which they pertain. "Since goodwill is inseparable from the business with which it is associated" (*Avon Shoe Co. v. David Crystal, Inc.,* 171 F.Supp. 293, 301, 121 U.S.P.Q. 397, 403 (S.D.N.Y.1959) aff'd, 279 F.2d 607, 125 U.S.P.Q. 607 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960)), when one speaks of the transfer of goodwill that accompanies a mark, one necessarily means the transfer of the portion of the business or service with which the mark is associated.

■ The consequence is that a mark may be transferred only in connection with the transfer of the goodwill of which it is a part. A naked transfer of the mark alone—known as a transfer in gross—is invalid.

This was the rule at common law (*see United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918)), which section 10 of the Lanham Act (15 U.S.C. § 1060 (1976)) adopts in its provision that a mark is "assignable with the goodwill of the business in which the mark is used, or that part of the goodwill of the business connected with the use of and symbolized by the mark." The Court of Customs and Patent Appeals, the decisions of which bind us (*see South Corp. v. United States,* 690 F.2d 1368, 1370, 215 U.S.P.Q. 657, 658 (Fed.Cir.1982) (*en banc*)), frequently has recognized and applied this rule. *See, e.g., Hy-Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947, 49 Cust. & Pat.App. 1163, 133 U.S.P.Q. 687 (1962). *See also Glamorene Products Co. v. The Procter & Gam-*

*ble Co.,* 538 F.2d 894, 190 U.S.P.Q. 543 (Cust. & Pat.App.1976); *Sterling Brewers, Inc. v. Schenley Industries, Inc.,* 441 F.2d 675, 169 U.S.P.Q. 590 (Cust. & Pat.App. 1971); *J.C. Hall Co. v. Hallmark Cards, Inc.,* 340 F.2d 960, 52 Cust. & Pat.App. 981, 144 U.S.P.Q. 435 (1965); 1 J. McCarthy, *Trademarks and Unfair Competition,* § 18:1 (1973).

■ A valid transfer of a mark, however, does not require the transfer of any physical or tangible assets. All that is necessary is the transfer of the goodwill to which the mark pertains. *Hy-Cross Hatchery,* 303 F.2d at 950, 49 Cust. & Pat.App. at 1165, 133 U.S.P.Q. at 689. *See also Glamorene Products,* 538 F.2d at 895–96, 190 U.S.P.Q. at 545; *Sterling Brewers,* 441 F.2d at 680, 169 U.S.P.Q. at 594; *J.C. Hall,* 340 F.2d at 963, 52 Cust. & Pat.App. at 984, 144 U.S.P.Q. at 437–38; *The Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, at 676–78 (7th Cir.1982); 1 J. McCarthy, *Trademarks and Unfair Competition,* § 18:7(B) (1973).

The rationale for the prohibition against a naked assignment of the mark without the accompanying goodwill stems from the nature of trademarks themselves. They identify the source of the goods and services offered. A key objective of the law of trademarks is protection of the consumer against being misled or confused as to the source of the goods or services he acquires. The rule against assignment of a mark in gross thus reflects "the need, if consumers are not to be misled from established associations with the mark, that it continue to be associated with the same or similar products after the assignment." *Raufast S.A. v. Kicker's Pizzazz, Ltd.,* 208 U.S.P.Q. 699, 702 (E.D.N.Y.1980).

In the light of these principles, we reject the Board's determination that the assignment in this case was invalid because there was no transfer of the goodwill to which the mark pertained.

■ B. The goodwill of Alpha Beta to which the mark pertained was not that of the firm's grocery business but that of a service ancillary to that business. "Check-

O.K." had been used only in connection with a check approval service that enabled customers to pay by check for their purchases upon showing the card. In the hands of Visa, the mark related to the same basic service, namely, providing a means by which the holders of the card could make purchases by check upon showing the card.

The Board stated that Visa provided a different service than Alpha Beta had provided because it guarantied independent merchants that the issuing bank would honor checks up to a stated amount, whereas the Alpha Beta card merely authorized the check-out clerk to accept the cardholder's check but provided no guaranty of payment. The Board further pointed out that the Visa program involved a third party—independent retail merchants—not involved in the Alpha Beta customer service.

The goodwill that attached to the Alpha Beta "Check-O.K." mark, however, related to the service provided to the cardholder, not to the store. The advertising and publicity about both cards were directed to users of the cards. The function the cards performed did not change when Alpha Beta assigned the mark and its related goodwill to Visa. Visa's advertising and publicity, like those of Alpha Beta, were directed to individuals who would find the cards useful in enhancing their ability to pay for goods and services with personal checks.

The Board also found that the Alpha Beta program's restriction of use of the card to the issuing store was not carried over to the Visa service. Although the category of stores in which Visa customers could use their cards was far broader than under the Alpha Beta card, the Visa cards performed for the cardholders the identical function that the Alpha Beta cards had performed. They enabled cardholders to obtain goods, services, or cash with personal checks by displaying the card.

The Visa and Alpha Beta programs were not identical. But the transfer of goodwill requires only that the services be sufficiently similar to prevent consumers of the service offered under the mark from being "misled from established associations with the mark." Where, as here, the basic service offered by the assignor is offered by the assignee, albeit in a significantly expanded way, there is no reason to presume that consumers will not be properly protected. Neither the Board nor Birmingham Trust has demonstrated that users of the Visa "Check-O.K." card would be confused or misled about the source, character, or nature of the service they would receive under the card. Thus the policy underlying the requirement that goodwill accompany the mark through the assignment does not compel the invalidation of the assignment. *See The Money Store v. Harriscorp Finance, Inc., supra,* at 678.

In sum, Alpha Beta's assignment of the mark was not an assignment in gross, but was a transfer of the check cashing service of Alpha Beta's business, *i.e.,* a transfer of the mark and the goodwill to which the mark pertained.

C. The remaining question is whether this otherwise valid assignment was vitiated because Visa simultaneously gave Alpha Beta a license to continue to use the mark for Alpha Beta's check acceptance program in Alpha Beta's own stores. We say simultaneously because, although the agreement between Alpha Beta and Visa to assign the trademark did not refer to the license back, the assignment and license back obviously were component parts of a single transaction. Both the purchase agreement and license agreement were prepared before the September 10, 1976 date shown on them. The date was inserted in ink in a blank space on each of the typewritten documents.

A license back of an assigned mark to enable the assignor-licensee to continue to conduct the same business or provide the same services under the mark is not a novelty. A number of courts, without discussion, tacitly have upheld the practice. *E.g., Geo. A. Hormel & Co. v. Hereford Heaven Brands,* 341 F.2d 158, 52 Cust. & Pat.App. 1012, 144 U.S.P.Q. 493 (1965) (continued use by assignor-licensee does not affect assignee-licensor's claim to priority in opposition to registration); *Raufast S.A. v. Kicker's*

*Pizzazz,* 208 U.S.P.Q. 699 (E.D.N.Y.1980) (license back to assignor did not mislead consumers); *Andrew Jergens Co. v. Woodbury, Inc.,* 273 F. 952 (C.D.Del.1921), *aff'd* 279 F. 1016 (3d Cir.1922); *but see Greenlon, Inc. of Cincinnati v. Greenlawn, Inc.,* 542 F.Supp. 890 (S.D.Ohio 1982) (assignment invalid when assignor continued to operate own business using mark concurrently with geographically remote use by assignee). Indeed, a leading trademark treatise, after stating that "[a]n assignment is valid even though it may reserve certain rights of use of the mark in the assignor," suggests that "[u]sually such a situation should be handled by an assignment of the mark and good will, followed by license back to the assignor of the mark." J. McCarthy, *Trademarks and Unfair Competition,* § 18.-1(E) at 608 (1973).

Neither the Board nor Birmingham Trust has given any convincing reason for striking down this apparently well-settled commercial practice.

■ A license back is valid if it satisfies the conditions of validity for trademark licenses generally. The principal requirement, and the only one here critical, is that "the licensing agreement provides for adequate control by the licensor over the quality of goods or services produced under the mark by a licensee.... The purpose of such a requirement is to protect the public from being misled." *Haymaker Sports, Inc. v. Turian,* 581 F.2d 257, 261, 198 U.S.P.Q. 610, 613 (Cust. & Pat.App.1978).

The license back from Visa to Alpha Beta met that requirement. As noted (*supra,* p. 1374), Alpha Beta agreed that "the nature and quality of all services rendered in connection with the Mark shall conform to standards set by, and under the control of, [Visa]." Alpha Beta also agreed to comply with "the following minimum standards:" that Alpha Beta would use the mark only in check approval cards it issued to its customers, that the cards would be used only in

Alpha Beta stores, and that upon a customer's display of a valid card containing the mark, Alpha Beta would accept the customer's check. Although the licensing agreement was of infinite duration, Visa had the right to terminate it for a "material breach of [its] provisions," which included the quality control provisions just described.

Contrary to the view of the Board, it is not determinative that there was "no evidence showing to what extent Visa has actually exercised real and effective control over the nature and quality of the services performed by Alpha Beta under the licensed mark." The license back provided for adequate control by Visa of Alpha Beta's use of the mark.[4] If Birmingham Trust contended that control was not exercised, it had the burden so to demonstrate. *See United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140, 209 U.S.P.Q. 457, 463 (3d Cir.1981); *Edwin K. Williams & Co. v. Edwin K. Williams, etc.,* 542 F.2d 1053, 1059, 191 U.S.P.Q. 563, 568 (9th Cir.1976); *Geo. A. Hormel & Co. v. Hereford Heaven Brands,* 341 F.2d 158, 160, 52 Cust. & Pat. App. 1012, 1014, 144 U.S.P.Q. 493, 495 (1965). Not only has Birmingham Trust not shown any lack of control, but it does not even make that claim.

## CONCLUSION

The decision of the Trademark Trial and Appeal Board is reversed.

REVERSED.

---

4. Since the license back is valid, it follows concomitantly that there is no split of goodwill from the mark. The mark is used for precisely the same services as before the assignment with use by the licensee inuring to the benefit of the licensor as a related company. 15 U.S.C. §§ 1055, 1127.