Kenneth W. LUDDEN, Plaintiff,

v.

**METRO WEEKLY and Isosceles Publishing, Inc., Defendants.**

**No. CIV.A. 97–0125(JHG).**

United States District Court, District of Columbia.

June 11, 1998.

---

Brian Cooper Plitt, Washington, DC, for Ken Ludden, Plaintiff.

Stephen B. Mercer, Sandler & Mercer, P.C., Rockville, MD, for Metro Weekly, Isosceles Publishing, Incorporated, Defendants.

### OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Kenneth W. Ludden ("Ludden") is the author of a newspaper advice column entitled "Dear Diva" that regularly appeared in the now-defunct *Michael's Entertainment Weekly*, a publication whose principal audience was the gay community in the District of Columbia and Baltimore metropolitan areas. Defendant Isosceles Publishing, Inc. ("Isosceles") is the publisher of *Metro Weekly* ("*MW*"), a publication that serves largely the same audience. *MW* publishes an advice column, initially entitled "Ask Diva," since renamed "Diva Dearest." In this suit, Ludden alleges, *inter alia*, that he is the owner of a federal trademark, DEAR DIVA, which Isosceles has infringed by publishing its advice column. Ludden alleges that *MW*'s column strongly resembles the "Dear Diva"

logo and format and that readers are likely to confuse the two columns.

Pending is Isosceles' motion for summary judgment. For purpose of its motion only, Isosceles admits that readers are likely to confuse its advice column with Ludden's "Dear Diva" column. Isosceles nonetheless believes it is entitled to summary judgment either because a newspaper column cannot be a good or service that is properly the subject of a trademark, or, if it can, any rights Ludden may have in the mark are junior to those of Isosceles. Isosceles is incorrect as a matter of law on the first point, and genuine issues of material fact preclude resolution of the second. The motion must be denied.[1]

### BACKGROUND

Unless otherwise noted, the following facts are not in dispute. In February 1993, Ludden entered into an agreement with Murray J. Greenburg ("Greenburg"), sole proprietor of Bladecomp, Inc. ("Bladecomp"), to pen a serial column entitled "Mary–Go–Round." The column was to be a soap opera depicting gay life in Washington, D.C., for Bladecomp's soon-to-be launched magazine, *Michael's Entertainment Weekly* ("*Michael's*"). After Greenburg reviewed Ludden's first "Mary–Go–Round" submission, Greenburg and Ludden entered into a separate agreement, under which Ludden would also write an advice column, entitled "Dear Diva," for *Michael's*. With respect to the Diva agreement, Ludden was to provide a month's supply of columns in advance, and he was to be paid $20.00 per column. *Michael's* was first published on April 1, 1993. Next to the name "Dear Diva" was a picture of Ludden in a wig and evening dress.

*Michael's* was published from April 1993 to April 1994, with a weekly circulation of 12,-000 copies. Pl.'s Opp'n Ex. 1 (Declaration of Murray J. Greenburg ("Greenburg Decl.") ¶¶ 2, 4). The "Dear Diva" column was the second most popular feature in the magazine. *Id.* ¶ 7. The parties agree that the initial idea of a "Dear Diva" column was Greenburg's.

They also agree that, at least initially, the column was written solely by Ludden. They hotly dispute who developed the Dear Diva persona and who had editorial control over the column. The record evidence also is equivocal as to whether the purported following for the column was drawn to Ludden's style, or to the existence of an advice column regardless of its author, and whether the audience associated the "Dear Diva" name with Ludden's style. *See, e.g.*, Pl.'s Opp'n Ex. 1 & Def.'s Mem. Ex. 13 (Deposition of Murray J. Greenburg ("Greenburg Dep.") at 12, 45, 50).

In May 1993, shortly after the "Dear Diva" column had made its debut, Ludden developed and began to perform a Dear Diva stage show. Ludden continues to appear in public as Dear Diva to the present. These live performances include segments during which Dear Diva gives advice and answers the audience members' questions.

In the Summer of 1993, Ludden traveled to Russia to choreograph a ballet for the Moscow Festival Ballet Company. During one of his trips there, Ludden was approached with a request to reprint the "Dear Diva" column in the *Lenningrad Gay Times* and in a publication in Prague. After a telephone conversation with Greenburg, Ludden authorized the republication of the "Dear Diva" column. Pl.'s Opp'n Ex. 2 (Deposition of Kenneth W. Ludden ("Ludden Dep.") at 105–07).

During 1993, after Ludden had returned from Russia, Ludden asked Greenburg for permission to register as the owner of the trademark DEAR DIVA. It is undisputed that Greenburg agreed. In Ludden's version, Greenburg said, "It's yours. You don't owe me anything. I hope you make a million bucks." Ludden Dep. at 108.

The record reflects that Greenburg signed a writing memorializing the agreement to allow Ludden to register DEAR DIVA, but the writing is not in the record. *See* Greenburg Dep. at 11. The intent of Ludden and Greenburg on this point is characterized

---

**1.** Pursuant to Local Rule 108(f), the Court has determined that an oral hearing is unnecessary; defendant's request for hearing is also denied.

quite differently by the parties. Isosceles contends that Greenburg agreed that Ludden could seek a trademark in the name "Dear Diva" only for his use in marketing other products, such as calendars, but that Bladecomp retained the rights to the goodwill in the "Dear Diva" column. Ludden on the other hand, understood that he had acquired ownership of the "Dear Diva" name and goodwill associated with the "Dear Diva" column. Portions of Greenburg's deposition testimony support this assertion.[2]

Ludden did not pay Greenburg for the rights to the DEAR DIVA mark. The consequence of this fact is disputed, and the record is murky as to whether Greenburg intended his permission to be a gift, whether it was recognition of rights Ludden had already obtained, or whether there was a transfer of some other benefit that could be properly characterized as consideration supporting the agreement that Ludden could seek to register the DEAR DIVA mark.

In July 1993, *Michael's* appeared with a "Dear Diva" column that had not been written by Ludden, allegedly because *Michael's* had run out of copy from Ludden and he was out of the country. Although Ludden was not the author of that "Dear Diva" column, it was accompanied by his "Diva" photograph. When Ludden learned that *Michael's* had published a "Dear Diva" column written by someone else, he approached Greenburg to clarify who had editorial control over the "Dear Diva" column. Ludden Dep. at 145–46. According to Ludden, he and Greenburg agreed that Ludden was the author of the column. *Id.*

Enter Randy Shulman ("Shulman"). In August 1993, Shulman was initially hired on a part-time basis to write a column in *Michael's*. In October 1993, Shulman was promoted to full-time editor of *Michael's* under the pseudonym, Alexander Preston Chandler, III. Early on, ill will developed between Ludden and Shulman. Greenburg Decl. ¶ 10.

At some point in late 1993 or early 1994, Ludden was again out of the country, and

*Michael's* had used all of the "Dear Diva" columns that he had supplied. As editor, Shulman assigned another writer to write the Diva column. A number of "Dear Diva" columns written by someone other than Ludden appeared in *Michael's* next to Ludden's photograph. Ludden Dep. at 147. When Ludden learned of this activity, he spoke with Shulman and demanded that the practice cease. *Id.* Ultimately, Ludden sent a demand letter to Greenburg asserting rights in the DEAR DIVA mark. *See id.* at 146–48; Pl.'s Opp'n Ex. 1 (letter of Jan. 12, 1994). The record is unclear as to how Greenburg responded.

In late 1993 or early 1994, *Michael's* began publishing the "Dear Diva" column without Ludden's photograph. In April 1994, *Michael's* ceased publication. Around the same time, Shulman formed Isosceles to publish a new magazine in a format resembling *Michael's*. In a writing dated April 11, 1994, Greenburg transferred the right to use *Michael's* display racks to Shulman for use by the new magazine. Pl.'s Opp'n Ex. 1 (agreement of April 11, 1994). Greenburg also transferred the rights to Shulman to use a number of the titles of columns that had appeared in *Michael's*, such as "Out on the Town," "In the Mix," and "Hearsay." *Id.* Absent from the list of column titles transferred by Greenburg was "Dear Diva." *Id.* Two weeks later, April 25, 1994, Isosceles' certificate of incorporation was issued.

Isosceles began publishing *Metro Arts and Entertainment Weekly* (also "*MW*") in May 1994. *MW* featured an advice column entitled "Ask Diva." Ludden was not the author of the "Ask Diva" column. Shulman chose the title "Ask Diva" because he had not obtained the rights to "Dear Diva" from Greenburg. Def.'s Summ. J. Mem. Ex. 31 & Pl.'s Opp'n Ex. 3 (Deposition of Randy Shulman ("Shulman Dep.") at 53, 55). Shulman says that he included the "Ask Diva" column in *MW* because "I wanted to have a continuance of certain columns that I thought had promise and were very—were growing in an

---

**2.** Q: (Attorney) ... [D]oes that mean that Ken [Ludden], once you had given him permission to trademark the name, it could have stopped you from using the Dear Diva column?

A: (Mr. Greenberg) I never thought of it, but I guess legally Ken probably could have stopped me from using the Dear Diva column.
Greenberg Dep. at 13–14.

interesting direction—including an advice column written by a character." *Id.* at 55.

Ludden alleges that "Ask Diva" appropriated the format of the "Dear Diva" column, but that "Ask Diva" dispensed "mean-spirited, non-educational and unhealthy answers to reader questions." Compl. ¶ 19. Ludden further alleges that readers of the "Dear Diva" column approached him to express displeasure with the advice tendered in the "Ask Diva" column and asked why Ludden had changed. *Id.* ¶ 25. Isosceles denies these allegations to the extent of its knowledge. Answer ¶¶ 19, 25.

In February 1994, before the curtain came down on *Michael's* and the first act of *MW* began, Ludden had engaged a law firm to file trademark registration forms on his behalf with the United States Patent and Trademark Office ("PTO") to place the DEAR DIVA mark on the Principal Register. As part of the application, Ludden signed a declaration asserting that he was the sole owner and user of the DEAR DIVA mark. Def.'s Mem. Ex. 25.3. The changeover from *Michael's* to *MW* occurred while that application was pending.

In June 1994, the PTO denied Ludden's application because the PTO determined that the DEAR DIVA mark identified only a portion of "applicant's publication," apparently inferring incorrectly that Ludden was both author of "Dear Diva" and publisher of *Michael's*. Def.'s Mem. Ex. 25.9, 25.10 (correspondence from PTO to Ludden). The PTO acknowledged that a newspaper column title could be registered as a trademark, but the examining attorney found that Ludden had failed to produce sufficient evidence that "Dear Diva" had been offered to the public as a separate good or had acquired a following separate from that of *Michael's*. *See id.*

After receiving legal advice, Ludden amended his application and sought listing of the DEAR DIVA mark on the Supplemental Register. The PTO approved the application. The certificate of registration was issued on April 11, 1995 for the service mark DEAR DIVA for the service of a magazine and newspaper advice column. Def. Mem. Ex. 25.12. Sometime around June 1995, Ludden's "Dear Diva" column was published

in *Wire* magazine in New York City and Miami. Ludden Dep. at 122–23. In January 1997, *MW* changed the name of its advice column from "Ask Diva" to "Diva Dearest."

## *DISCUSSION*

### A. Standard for Summary Judgment

To balance the combined interests of judicial economy and speedy resolution of disputes on the one hand with litigants' rights to their day in court on the other, it is well settled that summary adjudication is appropriate in cases where the parties' dispute properly is characterized as a disagreement on the law and inappropriate where the real conflict requires determination of relevant facts. The familiar formulation is that "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To defeat a motion for summary judgment, the non-moving party must offer more than mere allegations, *see id.* at 249, 106 S.Ct. 2505, and has the burden of designating specific facts showing there is a need for trial by the depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court's role is limited to determining if a factual controversy exists; resolving factual disputes goes beyond the Court's authority in ruling on a motion for summary judgment. *See Sherwood v. Washington Post*, 871 F.2d 1144, 1147 (D.C.Cir.1989).

### B. Whether the DEAR DIVA Mark Is Valid As a Matter of Law

#### 1. The Law of Trademarks

The practice of marking one's goods to identify their source is an ancient one. *See* 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (hereafter "MCCARTHY") § 5:1

(4th ed.1996) (providing examples of early trademarks). At common law, as an outgrowth of unfair competition law, courts recognized the right of one who used such a mark in trade to be protected against unauthorized use of the same or confusingly similar marks by others.

Federal trademark law made its first appearance in the latter nineteenth century, but it was only a cameo. *See Trade–Mark Cases,* 100 U.S. 82, 99, 25 L.Ed. 550 (1879) (finding first federal trademark statute unconstitutional nine years after enactment because it exceeded Congress's power to regulate commerce). Although some federal protection for owners of trademarks was available in the years thereafter, *see* MCCARTHY § 5:3, it was not until passage of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1501 *et seq.,* that federal trademark law took center stage. The Lanham Act protects

> any word, name, symbol, or device, or any combination thereof—
>
> (1) *used* by a person, or
>
> (2) which a person has a bona fide intention to *use* in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even ·if that source is unknown.

15 U.S.C. § 1127 (emphasis added).

Various reasons have been advanced for recognizing property rights in trademarks, such as protecting consumers from being confused about the source of the goods or services they purchase, *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 157, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), or protecting the goodwill earned by one from being appropriated by another. *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942).

■ But whether the focus is on consumer or producer, the touchstone of trademark law is use. *Cf. Feist Publications, Inc. v. Rural Telephone Serv. Co.,* 499 U.S. 340, 347, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Use of a word or other symbol in commerce is what invests it with property rights as a trademark because that use gives rise to goodwill—the association in the mind of the public between a good and the mark that it bears. *See Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 412–14, 36 S.Ct. 357, 60 L.Ed. 713 (1916). Use of a mark also determines priority of ownership, the strength of a mark and its geographic reach. *See, e.g.,* MCCARTHY §§ 16:4, 24:108, 26:27 (citing cases). Most importantly, analysis of how a mark has been used or is likely to be used is necessary to determine whether another use is likely to cause confusion in the mind of the consuming public. *E.g., Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.,* 821 F.2d 800, 805 (D.C.Cir.1987).

■ Because trademark rights spring from, and depend upon, the dynamics of use, resolution of trademark disputes often requires a more context-dependent approach than is necessary in other areas of intellectual property law. In patent and copyright law, where novelty and originality, respectively, are required to give rise to protection, certain general limitations on the scope of protection can be established. *See Bonito Boats,* 489 U.S. at 148–49, 109 S.Ct. 971 (non-novel designs are unpatentable and cannot be protected by state law); *Feist,* 499 U.S. at 350–51, 111 S.Ct. 1282 (facts and unoriginal compilation of facts cannot be protected by copyright regardless of how much effort expended to find and compile facts). By contrast, under the Lanham Act, a bright-line approach to the limits of trademark protection is far more difficult, if not impossible. *See Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 162–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (analyzing why a color is capable of trademark protection depending on use).

## 2. Trademark Protection for Magazine and Newspaper Column Titles

■ With these general principles in mind, we turn to Isosceles' suggestion that the title of a newspaper column cannot be protected as a trademark. Analysis of this proposition requires a determination of how newspaper

column titles, in particular "Dear Diva," have been used. There is little question that the title of an entire newspaper or magazine is amenable to trademark protection as a mark used in connection with a good. *See, e.g., The Gazette Newspapers, Inc. v. The New Paper, Inc.*, 934 F.Supp. 688, 693–94 (D.Md. 1996) (finding "Gazette" to be protectable, descriptive mark); *American Association for the Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244, 247–48 (D.D.C.1980) (Green, J.) (noting that *Science* magazine is protected by a valid mark); *see also New West Corp. v. NYM Co.*, 595 F.2d 1194, 1198 (9th Cir.1979) (noting that printed matter is a "good" within meaning of Lanham Act). Less developed is whether the title of a column contained within such a publication can be, or has been, used in a way that allows it to merit protection as a mark used in connection with a good or service distinct from that of the publication in which it appears.

Isosceles argues that "as a general rule" a newspaper or magazine section or column cannot be trademarked because it cannot be a distinct good or service. Def.'s Reply Mem. at 9.[3] Isosceles relies on two administrative decisions to support its contention. *See In re Broadcasting Publications, Inc.*, 135 U.S.P.Q. 374, 375, 1962 WL 8664 (1962) (Patent Office Trademark Trial and Appeal Board denying registration of "Colorcasting" section of trade publication *Broadcasting* ); *Ex parte Meredith Publishing Co.*, 109 U.S.P.Q. 426, 426–27 (1956) (Assistant Commissioner of Patents denying registration of "Better Homes & Gardens Prize Tested Recipes," a section of *Better Homes & Gardens* ). The result in each of these decisions may support Isosceles' argument, but the reasoning does not.

Nothing in the Lanham Act suggests that a newspaper column title is unprotectable. *See* 15 U.S.C. § 1112; 37 C.F.R. § 6.1 (schedule of "goods" including "paper and paper articles; ... printed matter, newspaper and periodicals"); *see also* MCCARTHY § 10:6 ("unregistered title of a newspaper

column can constitute a trademark"). Indeed, Isosceles' own authority recognizes that if there is any "general rule" in this context, it is that

> the question of registrability on the Principal Register [of a magazine section title] must be resolved first, on the basis of what an applicant has done with the section title, and the nature of the words or term comprising the title becomes important only after a showing has been made that the mark, in fact, has become distinctive as a result of what applicant has done.

*Ex Parte Meredith*, 109 U.S.P.Q. at 426. This essentially was the rule applied in the only other case to directly address whether the title of a newspaper or magazine column is amenable to protection as a trademark. *See Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 641 (9th Cir.1993).

In *Metro Publishing*, plaintiff published a free weekly entertainment newspaper, *Metro*, that contained a popular column entitled "Public Eye," which was sometimes referred to as "Eye." *Id.* at 638. Defendant, the daily newspaper for the area, replaced its "Weekend" insert that focused on arts and entertainment with a tabloid insert entitled *Eye*. *Id.* Plaintiff had introduced evidence that readers in the area actually confused plaintiff's "Public Eye" column with defendant's *Eye* publication. *Id.* at 639. The district court declined to issue a preliminary injunction on the theory that plaintiff was unlikely to succeed on the merits because plaintiff's column was not amenable to trademark protection. *Id.*

On appeal, plaintiff asked the Ninth Circuit to take judicial notice of the fact that the PTO had issued certificates of registration for the *New Yorker*'s "Talk of the Town" column, the *Wall Street Journal*'s "Up and Down Wall Street" column, and *U.S. News and World Report*'s "Currents" column as marks on goods distinct from the publications in which they appear. *Metro Publishing*, 987 F.2d at 641. Writing for the court,

---

3. Procedurally, Isosceles could have been barred from proceeding on this argument because it was raised for the first time in its reply brief. However, because the question of whether a newspaper or magazine column can be a good or service

properly the subject of a trademark is a little-discussed but increasingly important question that the Court would have raised *sua sponte*, Isosceles' argument on this point will be considered.

Judge Fletcher reversed the denial of a preliminary injunction, holding that "[r]eader recognition of and loyalty to a particular column are things of value in the newspaper publishing world and, under appropriate circumstances, merit protection under the Lanham Act." *Id.*

This Court finds *Metro Publishing* to be a sound application of the flexible analysis of use required by the Lanham Act. In the rapidly expanding media universe in which we now live, a bright-line rule excluding individual newspaper or magazine column titles from receiving trademark protection would be particularly disastrous. The broad sweep of the Lanham Act mandates that courts keep an eye open to the changing dynamics of use and context. *See Qualitex,* 514 U.S. at 162–63, 115 S.Ct. 1300.

The importance of context is underscored by the authority on which Isosceles relies. In his 1956 decision, the Assistant Commissioner opined that with respect to *Better Homes & Gardens:*

> The "goods" actually are magazines—not sections of magazines. When the magazine is purchased, the purchaser receives the sections whether he wants them or not, and it is doubtful that magazine readers *ordinarily* purchase a magazine merely to receive a section of it, or think of a magazine merely in terms of section title.

*Ex parte Meredith,* 109 U.S.P.Q. at 426 (emphasis in original). Assuming that the statement accurately reflects the view of readers at that time, much has changed since then. Even before the advent of the revolution in electronic publishing, newspapers carried syndicated columns—including advice columns such as "Dear Abby" and "Dear Ann Landers"—that, as "printed matter" were capable of being "goods" distinct from the publications in which they appear.

Now, there has been explosive growth in "printed matter," which under a flexible interpretation would have to include digitally stored text. The emergence of magazines available only on the Internet (so-called Web zines) have the potential to radically alter readers' view of the printed matter that they receive. *See* James F. Breisford, *Online Liability Issues: Defamation, Invasion of Privacy and Negligent Publishing,* 482 PLI/PAT 471, 528 (1997) (suggesting how the *Metro Publishing* holding applies to electronic publishing); *see also Blumenthal v. Drudge,* 992 F.Supp. 44, 47 (D.D.C.1998) (describing how electronic gossip column was made available to public).

The notions either that "it is doubtful that magazine readers ordinarily purchase a magazine merely to receive a section of it" or that "the purchaser receives the sections whether he wants them or not" may soon become quaint relics of the past, if they have not already. On the Internet, where one might use the title of a newspaper or magazine column as a search term, reading printed matter *à la carte* is both possible, and perhaps preferred by regular users of that medium. Other technological and cultural developments, such as the advent of so-called "push" technology, *see* Parry Aftab, *Bells and Whistles: Java and Push Technology* 1003 PLI/CORP. 69, 73–74 (1997), and the rise of "mass customization," Chris Woodyard, *Mass Production Gives Way to Mass Customization,* USA TODAY, Feb. 16, 1998, at B3, have the potential to allow readers to assemble their own personal electronic newspaper composed of columns from a number of different publications. These developments suggest that the identity of a column not only can be distinct from that of the publication in which it appears but also that an electronic column can exist independent of any single publication.

In this case, these developments serve only as a reminder that courts should be wary of adopting *per se* rules regarding the scope of protection under the Lanham Act and that reliance on out-of-date information regarding use is equally to be avoided. Relying solely on the present record, the Court holds that under the Lanham Act a newspaper or magazine column is capable of being a good or service distinct from the publication in which it appears and, therefore, that the title of a newspaper column or magazine is amenable to protection as a trademark in its own right so long as it meets the other requirements, such as distinctiveness and use.

With respect to "Dear Diva," Ludden's evidence that the column had generated goodwill distinct from that attached to *Michael's* and that the DEAR DIVA mark symbolized that goodwill is sufficient to withstand a motion for summary judgment. In addition, while Ludden's registration is only for the "Dear Diva" column, the record at this stage could lead a reasonable fact finder to find that the "Dear Diva" column and the "Dear Diva" stage show are related "goods" within the meaning of the Lanham Act. Ludden presents evidence that the idea for a Dear Diva show sprang from a reader's suggestion. Ludden Dep. at 109–11. This indicates both that the column had developed goodwill distinct from that attached to *Michael's* and that the goodwill associated with the column is linked to the goodwill for the Dear Diva stage show. Indeed, Shulman described the "Ask Diva" column as a "continuance" of "Dear Diva" and gave as his reason for continuing the column that he wanted "an advice column *written by a character.*" Shulman Dep. at 55, Def.'s Summ. J. Mem. Ex. 31 (emphasis added).

## C. Disputes of Material Fact Preclude Summary Judgment on Isosceles' Alternative Arguments

Isosceles argues in the alternative that even if Ludden owns a valid mark, he is a second-comer and is therefore not entitled to relief. The material facts underpinning this argument are very much in dispute and must await trial for resolution.

Isosceles' argument is based on the fact that the common law and the Lanham Act, with minor exceptions, grant trademark rights on a first-come, first-served basis. That is, because trademark rights spring from use, the first user of a mark is the senior user who has superior rights with respect to junior users of the same or confusingly similar marks. *E.g., Foxtrap, Inc. v. Foxtrap, Inc.,* 671 F.2d 636, 640 (D.C.Cir. 1982). With respect to whether Ludden is the senior user, the parties dispute both the date of Ludden's first use of the DEAR DIVA mark and the geographic area covered by it.

There is no dispute that *the* first use of DEAR DIVA was in April 1993, when *Michael's* published its first column bearing that name. The question is whether Ludden can establish that *his* use of DEAR DIVA dates to April 1993 either because he had the rights to the mark from first publication of *Michael's* or because he obtained the name and the goodwill in a valid assignment from Bladecomp. It has long been the rule, codified by the Lanham Act, that after a valid assignment the assignee (Ludden) inherits the assignor's (Bladecomp's) date of first use. *See* 15 U.S.C. § 1127; *Herring–Hall–Marvin Safe Co. v. Hall's Safe Co.,* 208 U.S. 554, 558–59, 28 S.Ct. 350, 52 L.Ed. 616 (1908) (Holmes, J.); *Replogle v. Air–Way Co.,* 287 F. 765, 766–67 (D.C.Cir.1923).

Isosceles argues that there has not been a valid assignment, and Ludden can only rely on his first use of the mark, which Isosceles claims was June 1995 when Ludden first published the column in *Wire.* Both of these claims rely on disputed issues of fact.

### 1. Whether Ludden Received An Assignment in Gross

Like other property, trademarks are assignable. To be valid, however, an assignment of a trademark must include an assignment of the goodwill associated with the mark. That is because a trademark has no independent significance apart from the goodwill it symbolizes. *Marshak v. Green,* 746 F.2d 927, 929 (2d Cir.1984); MCCARTHY § 18:2. An attempt to assign the mark divorced from its goodwill is termed an "assignment in gross," and will be held invalid. *See* 15 U.S.C. § 1060; *Marshak,* 746 F.2d at 929; *Visa v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371, 1375 (Fed.Cir.1982). The discontinuity would be too great. The consumer would have no assurance that she was getting the same thing in buying the product or service from its new maker. *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 362 (7th Cir.1993).

In the instant case, Isosceles does not dispute that Greenburg told Ludden in 1993 that the DEAR DIVA name was "all yours." Rather, Isosceles argues that Greenburg, on behalf of Bladecomp, only assigned Ludden the rights to the name for use with goods or

services different from the "Dear Diva" column, and that Bladecomp, as publisher of *Michael's*, retained the goodwill associated with the advice column. Thus, argues Isosceles, the assignment of DEAR DIVA from Bladecomp to Ludden was an invalid assignment in gross. If the Court were to agree with this argument, Ludden would not be divested of all rights in DEAR DIVA. Rather he would only be precluded from tacking his use of the mark onto Bladecomp's and would instead be left to rely only on his use to establish priority. *See Merry Hull & Co. v. Hi–Line Co.*, 243 F.Supp. 45, 52–53 (S.D.N.Y. 1965) (even if defendant had not validly acquired mark from estate of bankrupt company, the date of its own use could give it seniority over another user).

 The doctrine against assignments in gross is a remnant of the common law. *See, e.g., Mayer Fertilizer & Junk Co. v. Virginia–Carolina Chemical Co.*, 35 App. D.C. 425, 426–28 (D.C.Cir.1910). The doctrine is an *ex ante* prohibition to protect consumers from transfers that could lead to a fraud on the public. The majority of countries do not have a *per se* prohibition on assignments in gross or "naked licenses," and instead have adopted an *ex post* approach to evaluate whether a specific transfer is invalid. *See* MCCARTHY § 18:10. In this country, in the congressional debates surrounding passage of the Lanham Act, an attempt to prevent codification of the anti-assignment-in-gross rule failed. *Id.* (citing relevant legislative history). Nonetheless, while the rule became codified, it should not be applied as a "sterile formalism," and application should focus on its central purpose—consumer protection. *See The Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676–78 (7th Cir. 1982).

 In its motion, Isosceles fails to allege any potential fraud on the public flowing from the alleged assignment in gross from Greenburg to Ludden. Isosceles' suggestion that the alleged assignment should be invalidated unless Ludden can produce evidence of an express agreement transferring the goodwill in the "Dear Diva" column, promotes form over substance. Moreover, genuine issues of material fact preclude determination

of whether Greenburg's understanding with Ludden about the use of DEAR DIVA was an assignment in gross. Although it is possible to so interpret the agreement, taken in the light most favorable to Ludden, it is equally possible that Greenburg's statement was not an assignment at all but mere confirmation that Ludden had been the user of the mark all along.

Even assuming that Bladecomp was the first user of DEAR DIVA, and that Bladecomp transferred rights in the mark to Ludden, the mere fact that *Michael's* continued to publish a "Dear Diva" column, at times penned by a hand other than Ludden's, is not dispositive on the question of whether the goodwill was transferred. After a trademark is assigned, the parties can license-back the mark "to enable the assignor-licensee to continue to conduct the same business or provide the same services under the mark." *Visa*, 696 F.2d at 1376–77. "The crucial element [of a license-back] is that the licensor adequately control the quality of goods and services provided by the licensee under the licensed mark." *Id.* at 1377; MCCARTHY § 18:9.

Some evidence indicates that Ludden exercised control over the mark after the transfer when he returned from Russia and asserted his rights to editorial control. Ludden did not acquiesce in the publication of the "Dear Diva" columns not written by him and, had *Michael's* not folded, he could have prevented further publication of such columns. *See* Greenburg Dep. at 13–14. It is for the jury to determine what Greenburg and Ludden intended and who owns the rights in the DEAR DIVA mark, assuming that Ludden can convince them that such rights exist.

## 2. Determining the Date of Ludden's First Use of DEAR DIVA

The second half of Isosceles's argument is that if there were an assignment in gross then Ludden, without the benefit of the use of "Dear Diva" in *Michael's*, cannot establish that he began using the DEAR DIVA mark anytime before June 1995, the date he began publishing the "Dear Diva" column in *Wire*. June 1995 was long after Isosceles had begun publishing its "Ask Diva" column, and there-

fore Ludden's rights are junior to those of Isosceles. This half of the argument also relies on facts in dispute.

Isosceles argues that as a matter of law, Ludden's use of DEAR DIVA for his stage show—which use undisputedly predates Isosceles' first use of "Ask Diva"—does not count because the stage show is a different good or service from the advice column. On this record, that argument cannot prevail. Even if the jury agrees that Ludden was not the first user of the mark, and that there was an invalid assignment from Bladecomp to Ludden, the jury also will have to resolve whether Ludden's first use dates from the first performance of his stage show or from his first publication of "Dear Diva" in *Wire*. The record demonstrates a sufficient connection between the "Dear Diva" column and the stage show—in which Ludden appears dressed as he was depicted in connection with the "Dear Diva" column and in which he provides advice to audience members along the lines as was provided in the column—for a jury to find that Ludden's first use of the mark in the stage show gives him seniority for use of the mark in the service of providing a newspaper advice column as well.

### D. Copyright Ownership in the "Dear Diva" Columns Composed By Ludden

As an aside, although there are no copyright claims in this lawsuit, the parties dispute as a material fact the copyright ownership of the "Dear Diva" columns written by Ludden that appeared in *Michael's*. The theory appears to be that ownership of copyright rights in the column are indicative of ownership of trademark rights in the column's title. Perhaps. But ownership of trademark rights springs from use; copyright rights derive from authorship. The two inquiries are quite distinct.

In the event that the parties intend ·to press the point at trial, the relevant law should be clarified. The relevant facts are that Ludden and Greenburg expressly agreed that Ludden would own the copyright in the "Mary–Go–Round" series, but they had no express agreement regarding ownership of the copyright in the "Dear Diva"

columns written by Ludden. Ludden Dep. at 99. In the absence of a contract, ownership of the copyright in "Dear Diva" is determined by reference to the default provisions of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

Under the Copyright Act, a copyright is a bundle of exclusive rights, *see* 17 U.S.C. § 106, that vest initially in the "author" of a copyrighted work. 17 U.S.C. § 201. The author is generally considered the person(s) who create the work. But if the work is created in one of two specified situations, the employer of the creator(s) will be deemed to be the author and therefore the owner of the exclusive rights in the work. Such a work is termed a "work made for hire." A work of authorship will be a "work made for hire" if it is created (1) by an employee acting within the scope of her employment; or (2) by an independent contractor who has prepared a "specially commissioned work" that falls into one of nine categories—including "a contribution to a collective work"—where the parties have evidenced in a written instrument their intent that the work be considered made for hire. 17 U.S.C. § 101(1), (2).

The present record does not allow for a definitive determination of the issue, but Isosceles has no basis for claiming as an "undisputed" fact that Ludden's columns in *Michael's* were works made for hire. Under § 101(1), whether Ludden was an employee of *Michael's* publisher, Bladecomp, is determined by reference to the federal common law of agency. *See Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). That determination is an intensively fact-bound inquiry requiring consideration of a number of factors. *Id.* Some crossover exists with the trademark discussion above in that the determination of who had editorial control over the column is also relevant to whether Ludden is better labeled an independent contractor or an employee. *Id.*

Certain evidence tips in favor of viewing Ludden as an independent contractor. Ludden had two distinct contracts with Greenburg/Bladecomp—one for "Mary–Go–Round" and the other for "Dear Diva"—with distinct terms. With reference to other factors, Isos-

celes does not suggest that at any time Shulman, as editor of *Michael's,* had the right to assign additional work to Ludden. From the record, it is possible to infer that Ludden worked on his own time, at a place other than Bladecomp's offices, and that Ludden was paid on a piecemeal basis without receiving benefits or having federal taxes withheld by Bladecomp.

Assuming Ludden was an independent contractor, Bladecomp could still be the author of "Dear Diva" under § 101(2) if Ludden signed a writing to that effect and if "Dear Diva" was a contribution to a collective work, which is likely. *See* 17 U.S.C. § 101(2). The agreement struck by Greenburg and Ludden, however, was undisputedly oral. Ludden Dep. at 81, 104. The absence of a writing also is fatal to a claim that Bladecomp had become the owner of the exclusive copyright rights in Ludden's "Dear Diva" columns by assignment. *See* 17 U.S.C. § 204 (assignments of exclusive rights must be evidenced by a writing).

Thus, on this record, it seems more likely than not that Ludden is the author and owner of the copyright in the "Dear Diva" columns he wrote for *Michael's.* But this is not a point for the jury to resolve. Should the parties seek to introduce evidence on the copyright ownership of the columns, it will be tested for relevance against the trademark and other state-law claims in the complaint.

### E. Modifying the Caption

■ A minor issue has arisen with respect to the proper parties in this suit. In addition to suing Isosceles, Ludden sued *Metro Weekly* as a party in its own right. Ludden alleges that *Metro Weekly* is an unincorporated partnership or association. Compl. ¶ 2. Isosceles responds that *Metro Weekly* is simply the name of the magazine that Isosceles publishes. Answer ¶ 2. Neither party has produced evidence directly on this point.

Rule 17(b) of the Federal Rules of Civil Procedure provides that:

[C]apacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) . . . .

FED. R. CIV. P. 17(b). Thus, if there is any basis for Ludden's allegation that *MW* is a partnership, Rule 17 allows him to sue it at least with respect to his federal claims, Counts 1 and 2.

With respect to his pendent state law claims, at the time Ludden filed his suit, partnerships and unincorporated associations were not amenable to suit as entities distinct from their members. *See, e.g., Kauffman v. Anglo–American School of Sofia,* 28 F.3d 1223, 1225 (D.C.Cir.1994); *Pritchett v. Stillwell,* 604 A.2d 886, 889 (D.C.1992). The law has changed; the District of Columbia adopted the Revised Uniform Partnership Act effective January 1, 1998. Partnerships can now be sued as entities in their own right. *See* D.C. CODE §§ 41–152.1 (embracing entity theory of partnership); 41–153.7(a) (partnership amenable to suit). This change in local law has not been fully absorbed yet. *See, e.g.,* SCT R. 17(b) (still stating that under common law of District of Columbia partnerships lack capacity to sue or be sued). As a result, if *MW* were a partnership, it would properly be a party to this suit.

However, Ludden has produced no evidence to support the existence of a *Metro Weekly* partnership or association. The thin record evidence supports Isosceles' assertion that no such partnership exists. *See* Shulman Dep. at 53, 55; Greenburg Decl. ¶¶ 11, 14. Therefore, the Complaint will be dismissed against *Metro Weekly.* Ludden will have a limited opportunity to move to reinstate the Complaint.

### CONCLUSION

Accordingly, it is hereby

**ORDERED** that Isosceles' Motion for Summary Judgment is DENIED; and it is

**FURTHER ORDERED** that the Complaint is DISMISSED as to defendant *Metro Weekly.* For 30 days from the date of this

Opinion and Order the dismissal will be without prejudice. Within that time Ludden may move to reinstate the Complaint against *Metro Weekly* if he can produce evidence that raises a genuine issue of material fact as to whether a partnership or association exists. After that time, if no motion has been made, the dismissal will stand *with* prejudice without further action from the Court. And it is

**FURTHER ORDERED** that counsel shall appear in Chambers on **July 6, 1998** at **9:30 a.m.** for a status/settlement conference. Counsel shall bring maximum settlement authority with them. The parties shall be available either in a witness room in the Courthouse or by telephone.

IT IS SO ORDERED.