This Opinion is a
Precedent of the TTAB

Hearing: October 18, 2022          Mailed: March 30, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

\_\_\_\_\_

Trademark Trial and Appeal Board

\_\_\_\_\_

*In re The New York Times Company*

\_\_\_\_\_

Serial Nos. 90106071, 90112154, 90112577, 90115155,
90115491, and 90115337[1]
(consolidated)

\_\_\_\_\_

Jordan A. LaVine of Flaster Greenberg PC,
   for The New York Times Company.

Catherine Caycedo, Trademark Examining Attorney, Law Office 101,
   Zachary R. Sparer, Managing Attorney.

\_\_\_\_\_

Before Lykos, Shaw, and Hudis,
   Administrative Trademark Judges.

---

[1] On January 10, 2022, the Board granted Applicant's motion (filed December 28, 2021 at 6 TTABVUE) to consolidate these appeals. 7 TTABVUE. *See, e.g., In re Anton/Bauer Inc.*, 7 USPQ2d 1380, 1381 (TTAB 1988) (applicant's motion to consolidate appeals granted). The Examining Attorney's subsequent motion to consolidate (filed May 17, 2022 at 12 TTABVUE) was superfluous.

  Citations to the prosecution record are to each application file from the USPTO's Trademark Status & Document Retrieval ("TSDR") system. Citations to the appeal record are to TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry, if applicable. Unless otherwise noted, citations are to "parent" Application Serial No. 90106071.

Opinion by Lykos, Administrative Trademark Judge:

The New York Times Company ("Applicant") filed six applications under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), to register the following marks in standard characters[2] on the Principal Register:

> Application Serial No. 90106071 for the mark THE NEW OLD AGE for "**Columns** on the subject of science, aging, health, and personal finances" in International Class 16 and "Providing on-line publications in the nature of articles, **columns**, and newspapers in the field of science, aging, health, and personal finances" in International Class 41;[3]

> Application Serial No. 90112154 for the mark A GOOD APPETITE for "**Columns** on the subject of cooking, food and dining" in International Class 16 and "Providing on-line publications in the nature of articles, **columns**, and newspapers in the field of cooking, food and dining" in International Class 41;[4]

> Application Serial No. 90112577 for the mark HUNGRY CITY for "**Columns** on the subject of restaurants, cooking, food and dining" in International Class 16 and "Providing on-line publications in the nature of articles, **columns**, and

---

[2] In the applications, each mark appears on the drawing page in initial capitalization, but Applicant retains a claim as to standard characters and not special form. *See* Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a) (setting forth requirements for standard character mark); *see also* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 807.03 ("Standard Character Drawings") (July 2022). For consistency in analyzing standard character and typed marks, our references to Applicant's marks in this opinion in all uppercase letters reflects that a term in standard character format is not limited to any particular type case, font style, size, or color. *See In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1910 (Fed. Cir. 2012). *See also In re Calphalon Corp.,* 122 USPQ2d 1153, 1158-61 (TTAB 2017) (applicant's amendment of mark from SHARPIN to SharpIn did not transform mark from standard character to special form).

[3] Filed August 11, 2020, claiming October 22, 2013, as the date of first use anywhere and in commerce for International Classes 16, and July 3, 2008 as the date of first use anywhere and in commerce for International Classes 41.

[4] Filed August 13, 2020, claiming February 7, 2007, as the date of first use anywhere and in commerce as to International Classes 16 and 41.

newspapers in the field of restaurants, cooking, food and dining" in International Class 41;[5]

Application Serial No. 90115155 for the mark WORK FRIEND for "**Columns** on the subject of business, office, money, careers and work-life balance" in International Class 16 and "Providing on-line publications in the nature of articles, **columns**, and newspapers in the field of business, office, money, careers and work-life balance" in International 41;[6]

Application Serial No. 90115491 for the mark OFF THE SHELF for "**Columns** on the subject of personal finance, work-life balance, careers, and business" in International Class 16 and "Providing on-line publications in the nature of articles, **columns**, and newspapers in the field of personal finance, work-life balance, careers, and business" in International Class 41;[7] and

Application Serial No. 90115337 for the mark LIKE A BOSS for "**Columns** on the subject of careers, work and business" in International Class 16 and "Providing on-line publications in the nature of articles, **columns**, and newspapers in the field of careers, work and business" in International Class 41.[8]

Emphasis added.

Applicant appealed the Trademark Examining Attorney's final refusals to register each mark under Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§ 1051, 1052 and 1127, on the ground that Applicant's specimens show that the marks

---

[5] Filed August 13, 2020, claiming May 23, 2012, as the date of first use anywhere and in commerce as to International Classes 16 and 41.

[6] Filed August 14, 2020, claiming November 5, 2018, as the date of first use anywhere and in commerce as to International Classes 16 and 41.

[7] Filed August 14, 2020, claiming May 9, 2004, as the date of first use anywhere and in commerce as to International Classes 16 and 41.

[8] Filed August 14, 2020, claiming November 9, 2018, as the date of first use anywhere and in commerce as to International Classes 16 and 41.

"identify only individual portions of [A]pplicant's publication" and therefore are not used on separate goods in trade.[9] The refusals to register are limited to the International Class 16 goods; thus, the International Class 41 services are not part of this appeal.

Following issuance of the final refusals, Applicant timely filed notices of appeal, and requests for reconsideration. The Board suspended the appeals. After the Examining Attorney denied Applicant's requests for reconsideration, the appeals were resumed and consolidated. Applicant and the Examining Attorney exercised their discretion to file separate briefs in each appeal. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 1214 (2022) ("The applicant (and/or the examining attorney) may file a different brief in each case, if the applicant (and/or the examining attorney) so desires."). An oral hearing before a panel of the Board was held on October 18, 2022.

For the reasons set forth below, we reverse the refusals to register the marks for the goods identified in International Class 16.

## I.    Goods in Trade Refusal - General Background

A "goods in trade" refusal is predicated on Sections 1, 2 and 45 of the Trademark Act. *See, e.g. In re S'holders Data Corp.*, 495 F.2d 1360, 181 USPQ 722, 723 (CCPA 1974) ("Although the Act does not define 'goods,' the definition of a 'trademark' in **section 45** declares that it is used 'to identify goods' and **section 2** refers to 'goods in commerce.'"). Sections 1 and 2 of the Trademark Act require that the subject matter

---

[9] Examining Attorney's Brief, 4 TTABVUE 14.

presented for registration be a "trademark." 15 U.S.C. §§ 1051 and 1052. Section 45 of the Trademark Act defines a "trademark" as "any word, name, symbol, or device, or any combination thereof used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. This section further provides that a mark shall be deemed to be in use in commerce on goods when "it is placed in any manner on the goods or their containers ... or on the tags or labels affixed thereto ... and the goods are sold or transported in commerce." *Id.*

"[T]he mark must be used in such a manner that it would readily be perceived as identifying the specified goods and distinguishing a single source or origin for the goods." *In re Aerospace Optics, Inc.*, 78 USPQ2d 1861, 1862 (TTAB 2006) (citing *In re Safariland Hunting Corp.*, 24 USPQ2d 1380 (TTAB 1992)). In addition, "[t]he statute is clear that the actual sale of goods is not required to satisfy [Section] 1127's 'use in commerce' requirement, provided that the goods are 'transported' in commerce." *Lens.com, Inc. v. 1-800 Contacts, Inc.,* 686 F.3d 1376, 103 USPQ2d 1672, 1675 (Fed. Cir. 2012) (citations omitted). However, "[i]n assessing rights stemming from transportation [of goods], courts and commentators have required an element of public awareness of the use." *Id.* (quoting *Gen. Healthcare Ltd. v. Qashat*, 364 F.3d 332, 335 (1st Cir. 2004)).

Proposed marks not used on "goods in trade" are ineligible for registration on the Principal Register under Section 2(f) of the Trademark Act or on the Supplemental

Register with the exception of non-syndicated columns in print format or on recorded media,. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1202.06 (July 2022).

In general, incidental items that an applicant uses in conducting its business (such as letterhead, invoices, reports, boxes, and business forms), as opposed to items sold or transported in commerce for use by others, are not goods in trade. *See, e.g., In re S'holders Data Corp.*, 181 USPQ at 723 (reports not goods in trade, where applicant is not engaged in the sale of reports, but solely in furnishing financial reporting services, and reports are merely a conduit through which services are rendered); *In re Thomas White Int'l, Ltd.*, 106 USPQ2d 1158, 1162-63 (TTAB 2013) (applicant's annual report does not constitute a "good in trade," but rather "is a common and necessary adjunct to the rendering of applicant's investment management and research services"); *In re MGA Entm't, Inc.,* 84 USPQ2d 1743, 1746-47 (TTAB 2007) (applicant's trapezoidal cardboard boxes for toys, games, and playthings held to be merely point of sale containers for applicant's primary goods and not separate goods in trade, where there was no evidence that applicant is a manufacturer of boxes or that applicant is engaged in selling boxes as commodities in trade); *In re Compute-Her-Look, Inc.*, 176 USPQ 445, 446-47 (TTAB 1972) (reports and printouts not goods in trade, where they are merely the means by which the results of a beauty analysis service is transmitted and have no viable existence separate and apart from the service); and *Ex Parte Bank of Am. Nat'l Trust and Savings Ass'n,* 118 USPQ 165, 165 (Comm'r Pats. 1958) (mark not registrable for passbooks, checks and other

printed forms, where forms are used only as necessary tools in the performance of banking services, and the applicant is not engaged in printing or selling forms as commodities in trade).

## II.    Goods in Trade Refusal - Columns

Historically, the USPTO has treated non-syndicated print newspaper columns in International Class 16, and by logical extension publications recorded or downloaded on International Class 9 electronic media such as CD-ROMs, as failing to rise to the level of "goods in trade." According to TMEP Section 1202.07(a) ("Marks That Identify Columns and Sections of Printed, Downloadable, or Recorded Publications in §1(a) Applications"):

> A column, section, or supplement of a publication that is printed, downloadable, or recorded on electronic media is normally not considered to be separate "goods" or "goods in trade," unless it is sold, syndicated, or offered for syndication separate and apart from the larger publication in which it appears.

The USPTO has carved out an exception for marks that identify non-syndicated columns or sections of printed newspapers by making them eligible for registration on the Principal Register under Trademark Act Section 2(f), 15 U.S.C. § 1052(f), upon a showing of acquired distinctiveness, or on the Supplemental Register. TMEP § 1202.07(a)(ii).  These exceptions constitute an acknowledgment by the USPTO that non-syndicated columns or sections of printed newspapers may, with a showing of acquired distinctiveness, function as source indicators, or alternatively may be capable of functioning as source indicators if registered on the Supplemental Register.  The USPTO's practice of refusing marks identifying non-syndicated

columns in print format is based on decisions issued at a time when news or opinion columns were only available to consumers as part of the overall purchase of a particular newspaper, magazine or other type of publication in print format. *See, e.g., In re Broad. Publ'ns*, 135 USPQ 374 (TTAB 1962) and *Ex parte Meredith Publ'g*, 109 USPQ 426 (Comm'r Pats. 1956). The TMEP relies on the analysis set forth in *Meredith Publishing* below for a "goods in trade" refusal of print columns:

> The basic question is whether or not, under the circumstances of use, the section title is a name adopted and used by the publisher to identify his goods and distinguish them from those of others. The "goods" actually are magazines - not sections of magazines. When the magazine is purchased, the purchaser receives the sections whether he wants them or not, and it is doubtful that magazine readers **ordinarily** purchase a magazine merely to receive a section of it, or think of a magazine merely in terms of a section title. Sections of magazines are not in and of themselves articles of commerce other than as a part of an integrated whole; and we must therefore be concerned with whether a section title actually identifies and distinguishes, and if so, what it distinguishes. Under these circumstances it becomes necessary to ask: Was the mark adopted to identify a section of applicant's magazine and distinguish it from sections of other publishers' magazines, or was it adopted to distinguish one section of applicant's magazine from the other sections of its magazine? **Ordinarily**, it is the latter.

TMEP § 1202.07(a) (quoting *Meredith Publ'g,* 109 USPQ at 426) (emphasis in original).

By contrast, because the provision of an online non-downloadable column is considered an International Class 41 service, it is not subject to a "goods in trade"

refusal.[10] *Id.* Relying on dicta from *Ludden v. Metro Weekly*, 8 F. Supp. 2d 7, 47 USPQ2d 1087, 1093 (D.D.C. 1998), the USPTO's stated rationale is that "[u]nlike a printed, downloadable, or recorded column or section, an online non-downloadable column or section can be accessed directly and can exist independent of any single publication as legal support." *Id.* The TMEP does not provide guidance regarding the treatment of a proposed mark that identifies both print and online news or opinion columns.

Applicant does not dispute its print columns are not syndicated.[11] Applicant does not seek to register its marks in International Class 16 on the Principal Register under Trademark Act Section 2(f) or on the Supplemental Register.[12] Thus, the question before us is whether Applicant's International Class 16 printed columns are independent "goods in trade"—that is, items sold or transported in commerce for use by others—or merely ancillary or incidental to its goods or services.

---

[10] Under the USPTO's classification system based on the NICE AGREEMENT CONCERNING THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES, to which the United States is a contractual party, printed publications are considered goods whereas online publications are classified as services. *See The Nice Classification, Twelfth Edition, version 2023* (NCL 12-2023) (effective Jan. 1, 2023)*; see also* Section 30 of the Trademark Act, 15 U.S.C. § 1112 ("The Director may establish a classification of goods and services, for convenience of Patent and Trademark Office administration, but not to limit or extend the applicant's or registrant's rights."); 37 C.F.R. § 6.1 (the international classification schedule for goods and services); and the USPTO's ACCEPTABLE IDENTIFICATION OF GOODS AND SERVICES MANUAL ("ID Manual") available at https://idm-tmng.uspto.gov/id-master-list-public.html.

[11] The record is devoid of evidence that any of Applicant's columns are separately sold on an individual basis.

[12] During prosecution of each application, the Examining Attorney advised Applicant that it could obviate the refusals by submitting evidence that the columns are in fact separate goods in trade (for example, through syndication); submit sufficient evidence of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f); or amend to the Supplemental Register pursuant to Trademark Act Section 23, 15 U.S.C. § 1091. Applicant did not afford itself of these options.

With this in mind, we now look to the evidence of record and arguments presented to ascertain whether Applicant's non-syndicated print columns are separate goods in trade.

### A.    Summary of Arguments and Evidence

Relying on the guidance set forth in TMEP Section 1202.07(a)(ii) and cases cited therein, the Examining Attorney takes the position that because Applicant's marks identify individual portions (i.e., non-syndicated news or opinion columns) of Applicant's newspaper in print format, they do not identify "separate goods in trade" within the meaning of Trademark Act Sections 1, 2, and 45. The Examining Attorney points to the International Class 16 specimens for each mark displaying a "picture of a portion of a New York Times printed publication in which the applied-for mark is used in a header to indicate the name of a particular column contained within the printed publication."[13] She also notes Applicant's own description of the specimens in each application as a "printout of [a] column."[14] We highlight as an example the relevant portion of the International Class 16 specimen for the mark THE NEW OLD AGE for "Columns on the subject of science, aging, health, and personal finances:"[15]

---

[13] Examining Attorney's Brief, 14 TTABVUE 4. The pages from the applications at which the submitted Class 16 and 41 specimens may be found are provided in the Appendix following this decision.

[14] *Id.*

[15] Specimen filed with Application Serial No. 90106071 on August 11, 2020 at TSDR 1.

The Examining Attorney's argues that:

> [A]pplicant's mark is not used to distinguish its column from columns in **other publications**, but rather to distinguish it from others in **its own** publication (whether online or in print). The fact that consumers can purchase applicant's online newspaper without purchasing its print newspaper does not show that the column itself is a separate good in trade, but only shows that applicant offers its Class 41 services separately from its Class 16 goods.[16]

---

[16] Examining Attorney's Brief, 14 TTABVUE 6.

The Examining Attorney relies on the distinction made in TMEP Section 1202.07(a)(ii) between a printed column not separately sold or syndicated and a column provided in the format of an online publication as an International Class 41 service that is not also separately sold individually or syndicated. By way of comparison, the International Class 41 specimen for the mark THE NEW OLD AGE for "Providing on-line publications in the nature of articles, columns, and newspapers in the field of science, aging, health, and personal finances" is reprinted in part below:[17]



Applicant counters that its International Class 16 printed newspaper columns are "independently accessible" thereby making them "goods in trade."[18] As support,

---

[17] Specimen filed with Application Serial No. 90106071 on August 11, 2020 at TSDR 2-4.

[18] Applicant's Brief, 10 TTABVUE 3.

Applicant submitted Internet search engine results showing that consumers can independently access the newspaper columns with the same content either through Internet searches for the name of the column or at separately dedicated pages within the nytimes.com website. Reprinted below are the Google® search results for "the new old age new york times:"[19]

---

[19] February 24, 2021 Response to Office Action 2-3.

The refusal before us is distinguishable from a refusal on the ground that a proposed mark is the title of a single work. *See Herbko Int'l, Inc. v. Kappa Books, Inc.,* 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) ("This court's precedent ... clearly holds that the title of a single book cannot serve as a source identifier."). Originally applied to books, the refusal applies to single creative works with content that does not change, but the refusal does not apply to a series of works, because they are not single. A series is not established when only the medium of the work is changed to electronic format. *See Mattel Inc. v. Brainy Baby Co.,* 101 USPQ2d 1140, 1143 (TTAB 2011) (finding that a program recorded on both a VHS tape and a DVD were the same creative work, and that the addition of minor enhancements in the DVD did not transform this single work into a series). The refusal also does not apply to activity books with changing content. Due to its reoccurring nature with different content at each occurrence, a trademark for a news or opinion column such as we have now in the appeals before us, by definition, cannot be the title of a single work.





## B. Legal Analysis

The USPTO's practice of issuing "goods in trade" refusals of non-syndicated columns in print publications is based on *Broadcasting Publications* and *Meredith Publishing*. Both opinions were rendered before the advent of the Internet and the ubiquitous availability to consumers of electronic media including online columns, online publications, as well as Internet search engines. At that time, the delivery mechanism for a newspaper or magazine column was much more limited, with the result that "[s]ections of magazines [or newspapers] are not in and of themselves

articles of commerce other than as a part of an integrated whole" as the *Meredith Publishing* opinion found. *See Meredith Publ'g*, 109 USPQ at 426. The administrative tribunal in *Meredith Publishing* was not rigid in its thinking and did not necessarily intend to impose a per se prohibition to registration of such designations. Rather, it found critical the importance of consumer perception:

> Was the mark adopted to identify a section of applicant's magazine and distinguish it from sections of other publishers' magazines, or was it adopted to distinguish one section of applicant's magazine from the other sections of its magazine?

> It is recognized that in some instances magazine section titles may have been so advertised, promoted and advanced that readers have developed a conscious association between the section title and the magazine and its publisher.

> Thus, it is seen that the question of registrability on the Principal Register must be resolved first on the basis of what applicant has done with the section title.

*Id.*

Likewise, in adopting the foregoing rationale from *Meredith Publishing,* the Board noted in *Broadcasting Publications* that "[s]ections of magazines and other periodicals in which there is no trade as such are not in and of themselves articles of commerce but it does not necessarily follow that titles therefor are not proper subject matter for registration on the Principal Register." *Broad. Publ'ns,* 135 USPQ at 374. In that case, the Board affirmed the refusal to register the proposed mark COLORCASTING for a section or column of a periodical publication on the ground that the record was devoid of evidence that "applicant has ever advertised, promoted or otherwise advanced its 'COLORCASTING' column separate and apart from the

magazine in which it appears" and that "the mark in question serves [no] purpose other than to distinguish one section of applicant's magazine from other sections of its magazine." *Id.* Thus, the Board implicitly postulated that the advertisement, promotion, or other similar activities of a column could rise to the level of qualifying such items as goods in trade.

The need for flexibility and appropriate context is echoed in *Ludden*. With extraordinary prescience, the United States District Court for the District of Columbia in *Ludden* cautioned courts about the dangers of adopting an overly rigid approach by making semantic distinctions between columns offered in print or digital media. *See Ludden,* 47 USPQ2d at 1093 (on summary judgment, the district court found as a legal matter that the title of a newspaper column can be protected as a trademark). *Ludden* begins with the pointed observation that when determining whether columns are eligible for trademark protections:

> In the rapidly expanding media universe in which we now live, a bright-line rule excluding individual newspaper or magazine column titles from receiving trademark protection would be particularly disastrous. The broad sweep of the Lanham Act mandates that courts keep an eye open to the changing dynamics of use and context. *See Qualitex*, [514 U.S. 159, 162-64, 115 S.Ct. 1300, 34 USPQ2d 1161 (1995)].
>
> * * * *
>
> Now, there has been explosive growth in "printed matter," which under a flexible interpretation would have to include digitally stored text. The emergence of magazines available only on the Internet (so-called Web zines) have the potential to radically alter readers' view of the printed matter that they receive. [internal citations omitted].

> The notions either that "it is doubtful that magazine readers ordinarily purchase a magazine merely to receive a section of it" or that "the purchaser receives the sections whether he wants them or not" may soon become quaint relics of the past, if they have not already. On the Internet, where one might use the title of a newspaper or magazine column as a search term, reading printed matter *à la carte* is both possible, and perhaps preferred by regular users of that medium. …
>
> … [T]hese developments suggest that the identity of a column not only can be distinct from that of the publication in which it appears but also that an electronic column can exist independent of any single publication. In this case, these developments serve only as a reminder that courts should be wary of adopting per se rules regarding the scope of protection under the Lanham Act and that reliance on out-of-date information regarding use is equally to be avoided.

*Id.*

As the *Ludden* court noted, changes in the marketplace for the delivery of news and opinion content have impacted consumer perceptions of what titles of non-syndicated columns represent, leading us to conclude that the correct legal standard for determining whether a non-syndicated column is a good in trade should no longer depend on the format in which it is offered. Whether a non-syndicated column that is, for example, "printed, downloadable, or recorded on electronic media," TMEP Section 1202.07(a), is a good in trade should be analyzed using the same standard we use to assess goods in trade issues in other contexts. We therefore take the opportunity to align the standards by adopting the three-part test set forth by the U.S. Court of Appeals of the Federal Circuit in *Lens.com* as our new test moving forward for non-syndicated print columns or sections in printed publications or

recorded media. By doing so, we now have one uniform test for analyzing "goods in trade."

According to the *Lens.com* test, factors to consider when evaluating whether an applicant's goods are in fact "goods in trade," include whether the goods are:[20]

> (1) simply the conduit or necessary tool useful only in connection with the applicant's primary goods or services;
>
> (2) so inextricably tied to and associated with the primary goods or services as to have no viable existence apart from them; and
>
> (3) neither sold separately nor of any independent value apart from the primary goods or services.

103 USPQ2d at 1676. *Accord Thomas White,* 106 USPQ2d at 1162 (applicant's annual report does not constitute a "good in trade" based on application of *Lens.com* factors). None of these factors alone is dispositive; this inquiry is a factual determination that must be made on a case-by-case basis. *Lens.com,* 103 USPQ2d at 1676.

Implicit in the *Lens.com* test is that we consider consumer perception as well as the consumer's experience or interaction with the product. The exception to the absolute bar to registration of "goods in trade" for marks that identify non-syndicated columns or sections of printed newspapers in the realm of "goods in trade" refusals by making them eligible for registration on the Principal Register, under Trademark

---

[20] To be clear, moving forward, the *Lens.com* test would only be applied to non-syndicated print columns to determine eligibility for registration on the Principal Register. Because syndicated print columns are already considered goods in trade, there would be no need to apply the *Lens.com* factors. *See* TMEP § 1202.07(a)(i) (discussing printed syndicated columns and sections of print publications, downloadable publications, or publications recorded on electronic media that are separately sold, syndicated, or offered for syndication). Thus, examining attorneys would only resort to this analysis if the identification of goods indicates that the printed columns are non-syndicated.

Act Section 2(f) or on the Supplemental Register, would be no longer necessary. This is because our adoption of the *Lens.com* test subsumes such considerations. Currently, in evaluating whether a non-syndicated print column has acquired distinctiveness under Section 2(f), the TMEP instructs examining attorneys to consider "evidence of promotion, long use, advertising expenditures, and breadth of distribution or sales figures that the public has come to recognize the proposed mark as an indicator of source;" whether "the column or section title is used and promoted to distinguish applicant's column or section from the columns or sections of other publishers' publications, rather than merely to distinguish applicant's column or section from other columns or sections of applicant's publication;" and whether a column is a "removable or pull-out section." TMEP Section 1202.07(a) (discussing the types of considerations in determining whether a non-syndicated column in print format has acquired distinctiveness). All of these would remain viable factors to consider either under or in addition to the *Lens.com* framework set out above for non-syndicated print columns.

### C.   Application of the *Lens.com* Factors

We now turn our attention to the *Lens.com* factors as applied to the applications now on appeal. We find that, on review of the records before us in each appeal, Applicant's International Class 16 print columns rise to the level of "goods in trade," despite the fact that they are not syndicated.

### 1. Are the individual print columns simply the conduit or necessary tool useful only in connection with obtaining *The New York Times* print edition of the newspaper?

With regard to the first *Lens.com* factor, Applicant's columns in print format are not simply a "conduit or necessary tool" to obtain Applicant's primary goods, *The New York Times* newspaper in print format. In other words, Applicant's columns are not akin to an "annual investment report … [that] is a common and necessary adjunct to the rendering of applicant's investment management and research services," *Thomas White,* 106 USPQ2d at 1162. Nor are Applicant's columns akin to an instructional manual or brochure describing to the reader how to use or navigate the entirety of *The New York Times* print edition. To suggest otherwise would be contrary to the evidence of record.

### 2. Are the individual print columns so inextricably tied to and associated with *The New York Time*s print edition of the newspaper as to have no viable existence apart the print newspaper?

Turning to the second *Lens.com* factor, we find that Applicant's columns are not "so inextricably tied to and associated with" Applicant's print newspaper as to have "no viable existence" apart from the newspaper. The Google® search engine results Applicant made of record show that its columns may be retrieved by searching the name (i.e., the proposed trademark) for each column. We find this constitutes evidence that consumers may separately seek out Applicant's columns apart from the newspaper as a whole. In other words, these search engine results are probative of consumer perception and consumer experience that the print columns possess a viable existence apart from the newspaper as a whole.

Typically in the context of other types of refusals such as a likelihood of confusion refusal under Trademark Act Section 2(d) or a mere descriptiveness refusal under Trademark Act Section 2(e)(1), a truncated search result summary from a search engine, such as Yahoo!® or Google®, which shows use of a phrase as key words by the search engine, is of limited probative value. *See* TBMP § 1208.03 ("Such search results do not show use of a term or phrase as a heading, link or content on a website, or there may be insufficient text to show the context within which a term is used."); *see also In re Consumer Protection Firm PLLC*, 2021 USPQ2d 238, at *21, n.28 (TTAB 2021) ("[A] list of Internet search results generally has little probative value, because such a list does not show the context in which the term is used on the listed web pages.").[21] Here, by contrast, Applicant has submitted the search results for a narrow purpose, to show merely that consumers recognize its print columns as possessing their own viable and separate existence. And in one of the applications, the evidence goes a step further and shows the applied-for mark identifying each column as referenced by other entities or individuals. The search engine results for Application Serial No. 90112577 for the mark HUNGRY CITY show references to the column

---

[21] This is especially true with regard to other refusals where the context of the entire web page is critical. *See, e.g., In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2003) (deeming Google® search results that provided very little context of the use of ASPIRINA to be "of little value in assessing the consumer public perception of the ASPIRINA mark"); *In re Tea & Sympathy, Inc.*, 88 USPQ2d 1062, 1064 n.3 (TTAB 2008) (finding truncated Google® search results entitled to little probative weight without additional evidence of how the searched term is used).

HUNGRY CITY on an array of websites such as MyEater.com, Fordham University, and Vice.com as well as the social media site "NY Cooking" on Facebook.[22]

We are not concerned with the meaning of the terms as is often the case with Internet evidence in evaluating other types of refusals such as a likelihood of confusion or mere descriptiveness. We also are not relying on the fact that *The New York Times* newspaper or individual columns are also available online to readers (as is evident from Class 41 services identified in each involved application).

We therefore find the search results probative because they show that each individual print column is not so inextricably tied to and associated with *The New York Tim*es print edition of the newspaper as to have no viable existence apart from the print newspaper as a whole.[23] As the *Ludden* court foresaw, consumers may readily use each title (i.e., the proposed trademark) of Applicant's applied-for print newspaper columns as a separate search term, making the reading of such columns "*à la carte*" not only possible but perhaps even preferred. *See Ludden,* 47 USPQ2d at 1093. Consumers therefore are likely to perceive the name of each print column for the specific content found therein to be distinct from *The New York Times* print newspaper as a whole.

---

[22] See Appendix B.3*, infra.*

[23] Our consideration of the Google® search engine results for the narrow purpose submitted here should not be read as the Board's general acceptance of search engine results in other situations where the presentation of the mark in the context of an entire web page would be critical to our analysis.

> ### 3. Are the print columns neither sold separately nor of any independent value apart from the print edition of *The New York Times* newspaper?

Under the final *Lens.com* factor, while we have no evidence that the print columns are "separately sold" or syndicated, the record shows they possess "independent value" separate and apart from Applicant's newspaper as a whole. An actual discrete sale of the columns is unnecessary to meet the "use in commerce" requirement, provided that the goods are 'transported' in commerce." *Lens.com,* 103 USPQ2d at 1675.

The search engine results support this finding insofar as consumers may look for and search for the name of the column, and then separately read the content for that column. It is not because the International Class 16 print columns are also provided online with the same content as the applied-for International Class 41 services that they have independent value. Rather, the search engine results show that the utility of the column is more than just a section within the print edition of *The New York Times*. The additional evidence in Application Serial No. 90112577 for the mark HUNGRY CITY showing references to the column HUNGRY CITY on other websites further supports a finding of "independent value" in that record.

Prior to the widespread availability of the Internet to consumers, the only way a printed newspaper column could reach a wide geographic area was through syndication.[24] The search engine results show the "independent value" of the print

---

[24] We take judicial notice of the definition of "syndication" from the online version of The Merriam Webster Dictionary (www.merriam-webster.com) as "the act of selling something (such as a newspaper column or television series) for publication or broadcast to multiple newspapers, periodicals, websites, stations, etc." *See In re White Jasmine LLC*, 106 USPQ2d

columns to consumers insofar as readers recognize the columns as separate goods to such a degree that they may be searchable by name and retrieve multiple results. This has a similar impact on the consumer's experience as traditional syndication.

### 4. Conclusion under *Lens.com*

In sum, the record supports a finding that Applicant's International Class 16 columns are "not simply a conduit or necessary tool only" for readers to obtain Applicant's newspaper in print format. The record shows that Applicant's columns are not "inextricably tied" to its print newspaper as a whole, but instead, separately exist and are independently valued by consumers. Consumer perception and consumer interaction with the product is critical. As posited in *Meredith Publishing*, the record shows that Applicant's marks identify individual columns of Applicant's print newspaper, distinguishing them from columns of other publishers' newspapers, and may be perceived as such by the public.[25]

We do not find, as Applicant argues, that the separate "goods in trade" are the online versions of the columns for which readers must purchase a separate subscription. Rather, we hold that such items may be registrable on the Principal Register without proof of acquired distinctiveness under Section 2(f), upon

---

1385, 1392 n.23 (TTAB 2013) (Board may take judicial notice of online dictionaries that exist in printed format or have regular fixed editions).

[25] Other examples of evidence showing public perception include, but are not limited to, consumer surveys, consumer affidavits, unsolicited media attention, and social media posts directed to an applicant's columns that identify applicant as their source.

consideration of the *Lens.com* factors and any other evidence that may be relevant in a particular case.

To be clear, our decision is not dependent on intermixing or conflating Applicant's online column services in International Class 41 with the print columns in International Class 16 in order to find that under *Lens.com* that the print columns constitute goods in trade. Our rationale is not based on the finding that Applicant's columns in print format are goods in trade simply because they are also provided with the same content in an online version. Moreover, we are not creating a per se rule that all non-syndicated newspaper columns existing in print format are goods in trade.

We therefore reverse the refusals to register Applicant's columns in International Class 16 under Trademark Act Sections 1, 2 and 45.

**Decision**: The refusals to register Applicant's marks in International Class 16 are reversed.

# APPENDIX

## A. Application Serial No. 90112154 for the mark A GOOD APPETITE

### 1. International Class 16 Specimen[26]



---

[26] Specimen filed with Application Serial No. 90112154 on August 13, 2020 at TSDR 3.

### 2. International Class 41 Specimen[27]



---

[27] Specimen filed with Application Serial No. 90112154 on August 13, 2020 at TSDR 4-5.

8/13/2020                                    A Good Appetite - The New York Times

June 22, 2020     **Spicy Pork Kebabs, Fast Enough for a Weeknight**

Loads of whole spices, plus green chile and garlic, infuse the meat, but the marinade can also work on just about anything.

June 12, 2020     **Crunchy, Creamy and Just Sweet Enough**

Juicy sugar snap peas are quickly blanched, then tossed with a creamy yogurt-feta dressing for a light but rich summer salad.

June 5, 2020      **This Isn't Strawberry Shortcake as You Know It**

Serve this summery pair with crunchy cookies instead of soft biscuits.

May 29, 2020      **The Best Way to Eat Grilled Salmon**

Pair it with crisp lettuces and a pungent chile-lime dressing for a light, summery dinner.

May 22, 2020      **You Can't Beat a Savory Babka**

This cheesy garlic-scented, herb-speckled version may just outshine the chocolate kind.

May 15, 2020

https://www.nytimes.com/column/a-good-appetite                                    2/3



### 3. Google® Search Engine Results[28]



---

[28] February 26, 2021 Response to Office Action at TSDR 2-3.



## B. Application Serial No. 90112577 for the mark HUNGRY CITY

### 1. International Class 16 Specimen[29]



---

[29] Specimen filed with Application Serial No. 90112577 on August 13, 2020 at TSDR 1.

## 2. International Class 41 Specimen[30]



---

[30] Specimen filed with Application Serial No. 90112577 on August 13, 2020 at TSDR 2-4.

8/13/2020                    Hungry City - The New York Times

**Feb. 28, 2020**

### Fish With an Egyptian Touch

At Hamido Seafood in Astoria, Queens, which opened last May, the staff will gently guide you toward the recipes best suited to your order.

**Feb. 20, 2020**

### Bottomless Brunch Means Bottomless Khao Tom at Noods n' Chill

From the team behind Plant Love House in Brooklyn, this Williamsburg restaurant focuses on porridge for brunch.

**Feb. 13, 2020**

### Banh Mi That Travels the World at JoJu

Call it fusion if you must, but, in the chef Julie Wong's hands, it's done in a way that doesn't assume the West is the starting point.

**Feb. 13, 2020**

### Embracing Queens 'as a Melting Pot'

Julie Wong, the chef at JoJu, set out to represent many of the borough's cultures, so the banh mi fillings at her restaurant aren't confined to tradition.

**Feb. 6, 2020**

### Balanced Soup Dumplings, and Much More, at 3 Times

At two Manhattan locations, xiao long bao are neatly pleated and filled with boisterously flavorful ingredients.

**Jan. 31, 2020**

https://www.nytimes.com/column/hungry-city                                    2/3



8/13/2020

Hungry City - The New York Times

### Sichuan That Moves Beyond Spiciness at Chuan Tian Xia

At this Sunset Park, Brooklyn, restaurant, mala — the province's distinct marriage of numbing force and feral heat — is only one shade of the meal.

SHOW MORE

### 3. Google® Search Engine Results[31]



---

[31] February 26, 2021 Response to Office Action at TSDR 2-3.



## C. Application Serial No. 90115155 for the mark WORK FRIEND

### 1. International Class 16 Specimen[32]



---

[32] Specimen filed with Application Serial No. 90115155 on August 14, 2020 at TSDR 1.

### 2. International Class 41 Specimen[33]



---

[33] Specimen filed with Application Serial No. 90115155 on August 14, 2020 at TSDR 2-4.

Work Friend - The New York Times

By ROXANE GAY

June 12, 2020

### What Do I Do if My Employer Does Something I Can't Abide?

You have to calibrate the difference between dumb and unacceptable, what you can live with and what you cannot.

By ROXANE GAY

May 29, 2020

### Is It Safe to Keep Employing a Cleaner? Wrong Question, Lady

Introducing your new Work Friend: Roxane Gay.

By ROXANE GAY

May 14, 2020

### Rich Boss, Young Employee, Angry Wife: It Gets Twisted

An email described an intimate ski trip between co-workers. But who really sent it?

By CAITY WEAVER

May 1, 2020

### Bored at Work? The Solution Involves a Small Orange Man

Plus: Once we all get back to work, let's give our pets a vacation. Forever.

By CAITY WEAVER

April 16, 2020

### I'm Working Remotely. Can I Keep Hiding My Secret Baby?

'I'm pretty sure he thinks it's a cat.'

ww.nytimes.com/column/work-friend



### 3. Google® Search Engine Results[34]



Oct 11, 2020 — J'Leen Manning Saeger misses her friends from work. ... Making the Most of the Relationships Where We Spend Most of Our Time. ... Page 7 of the New York edition with the headline: How to Connect With the ... See the latest.

Related searches ⋮

| | |
|---|---|
| work friend **meaning** | **the ethicist in the** new york times |
| work **friends quotes** | new york times **login** |
| work friend **colleague** | work friend **word** |
| work **friends colleagues** | new york times **advice column** |

1 2 3 4 5 6 7 8 9 10      Next

19010, Pennsylvania - From your device - Use precise location - Learn more

Help    Send feedback    Privacy    Terms

---

[34] February 26, 2021 Response to Office Action at TSDR 2-3.



Oct 11, 2020 — J'Leen Manning Saeger misses her friends from work. ... Making the Most of the Relationships Where We Spend Most of Our Time. ... Page 7 of the New York edition with the headline: How to Connect With the ... See the latest.

Related searches ⋮

| | |
|---|---|
| work friend **meaning** | **the ethicist in the** new york times |
| work **friends quotes** | new york times **login** |
| work friend **colleague** | work friend **word** |
| work **friends colleagues** | new york times **advice column** |

1 2 3 4 5 6 7 8 9 10     Next

19010, Pennsylvania - From your device - Use precise location - Learn more

Help     Send feedback     Privacy     Terms

### D. Application Serial No. 90115491 for the mark OFF THE SHELF

#### 1. International Class 16 Specimen[35]



---

[35] Specimen filed with Application Serial No. 90115491 on August 14, 2020 at TSDR 1.

## 2. International Class 41 Specimen[36]

BUSINESS

# Off the Shelf

A collection of "Off the Shelf" columns published in The New York Times.

Latest   🔍 Search

### Awkward Timing, but the Financial Ideas Are Still Sound

A book with a provocative title says you should have two equal goals when it comes to investing: Get all you can from both your money and your life.

### A Novel Offers a Do-It-Yourself Remedy for Financial Anxiety

Starting a business while you still have a job might make your financial life easier, a novel suggests. It also has nuggets for going out on your own if you are unemployed.

### Are You Overlooking Something That Could Make You Richer?

You probably aren't paying enough attention to your debt, an accountant argues in a new book, and that could be costing you.

### Reconsidering the Advice in 3 Popular Personal Finance Books

Books by Suze Orman, Dave Ramsey and Robert Kiyosaki don't tell us much about investing, our reviewer says, but their counsel still has value.

### Buying Lattes Is Not Keeping You From Being Rich

### 3. Google® Search Engine Results[37]



[36] Specimen filed with Application Serial No. 90115491 on August 14, 2020 at TSDR 2-3.

[37] February 26, 2021 Response to Office Action at TSDR 2-3.

Oct 8, 2020 — Use that money to gain control over your time so that you can, ... in print on Oct. 11, 2020, Section BU, Page 16 of the New York edition with the ... A collection of "**Off the Shelf**" columns published in The **New York Times**.

www.nytimes.com › harry-hurt-iii   ⋮

### Harry Hurt III - The New York Times

**Off the Shelf**. King of Beers, and a Slippery Throne. Julie MacIntosh examines how an American family's beer dynasty fell victim to a foreign takeover. By Harry ...

www.nytimes.com › 2020/07/27 › books › tom-hanks-gw...   ⋮

### The Celebrity Bookshelf Detective Is Back - The New York Times

Jul 27, 2020 — **On** "The Today Show," July 7. 1. The Presidential Recordings of Lyndon B. Johnson, Volumes 1-3: Transcripts of 700 hours of telephone ...

Ad · www.nytimes.com/ ▾ (888) 824-4085

### Subscribe Today From $1/Week - The New York Times

Subscribe to The **New York Times** Today For $1/Week For One Year. Subscriber Only Discounts. Free Access to NYT Apps. Multiple Bundle Options. 1+ Bonus Subscriptions. High Quality Journalism. Types: Culture, Business, Science, Style, Health & Wellness, Politics.
Rating for nytimes.com: 4.6 - 656 reviews - Return policy: Most items 30+ days
Subscribe: Home Delivery · Subscribe: Academic Rate · New York Times Crossword

1 2 3 4 5 6 7 8 9 10     Next

19010, Pennsylvania - From your places (Home) - Use precise location - Learn more

Help     Send feedback     Privacy     Terms

### E. Application Serial No. 90115337 for the mark LIKE A BOSS

#### 1. International Class 16 Specimen[38]



---

[38] Specimen filed with Application Serial No. 90115337 on August 14, 2020 at TSDR 1.

## 2. International Class 41 Specimen[39]

BUSINESS



Workweek diaries from a crazy-busy generation of creative talent.

Latest   🔍 Search

### Gemma Correll's Pandemic Diary: Just Like Her Normal Diary

The illustrator spends time with her pugs and counteracts social media with calm reality TV.



### The Pandemic Work Diary of a Napa C.E.O.

The first African-American to run a major winery, Carlton McCoy spends his days making his industry more approachable and more inclusive.



### The Work Diary of Gray Malin, Locked-Down 'Getaway' Photographer

Unable to shoot beach scenes out of a helicopter, he's exploring his archive and selling puzzles online.



### The Pandemic Work Diary of Netflix's Queer Champion

"Joining the ranks of every other clichéd gay in L.A.," Fran Tirado is writing scripts and monitoring the platform's L.G.B.T.Q. content.



### The Pandemic Work Diary of a Video-Streaming C.E.O.

From her parents' home, Vimeo's Anjali Sud oversees 600 employees and surging demand for feeds of documentaries, yoga classes and funerals.



https://www.nytimes.com/column/like-a-boss      8/14/2020

A Coffee C.E.O.'s Pandemic Diary: 'We Want to Still Provide an Escape'

Nick Stone, the founder of Bluestone Lane, says he is determined to see glimpses of humanity in a "devastating, absolutely devastating" crisis.

How Marie Kondo Declutters During a Pandemic

With promotional events for her new book canceled, the organizational expert finds solace in cooking, shredding documents and — of course — tidying her Los Angeles home.

The Work Diary of a Hairdresser So Coveted, She Travels by Private Jet

With a cult following on Instagram, Jayne Matthews gives $325 cuts to a far-flung clientele.

The Work Diary of Jessica Walsh, Designing (and Wining) Woman

The graphic designer and founder of a creative agency powers through insomnia, migraines and helping mom with Instagram.

The Work Diary of Derrius Quarles, Million-Dollar Multitasker

A former foster care child pays it forward exponentially with a financial app, brand strategy and a new government position.

SHOW MORE

https://www.nytimes.com/column/like-a-boss

8/14/2020

---

[39] Specimen filed with Application Serial No. 90115337 on August 14, 2020 at TSDR 2-3.

### 3. Google® Search Engine Results[40]



www.niemanlab.org › 2020/07 › newsonomics-the-new...

**Newsonomics: The New York Times' new CEO, Meredith ...**

Jul 30, 2020 — Meredith Kopit Levien knew early on that she'd like to head up a ... Last week, the Times announced Levien as its new CEO, succeeding her boss and ... $45: That's the share price of the New York Times Co. at Friday's close.

www.amctheatres.com › movies › like-a-boss-57274

**Like A Boss now available On Demand! - AMC Theatres**

Jan 10, 2020 — Like A Boss showtimes at an AMC movie theater near you. Get movie times, watch trailers and buy tickets.

www.pressherald.com › 2020/09/27 › new-york-times-t...

**New York Times: Trump paid $750 in U.S. income taxes in ...**

Sep 27, 2020 — New York Times: Trump paid $750 in U.S. income taxes in 2016, 2017 ... "Now, Donald Trump is the boss of the agency he considers an ...

**Related searches**

| | |
|---|---|
| new york times **routine** | new york times **spending sunday** |
| new york times a **day in the life** | new york times **owner** |
| new york times **corner office** | **international** new york times |
| new york times **articles** | new york times **what they do on sundays** |

1 2 3 4 5 6 7 8     Next

19010, Pennsylvania - From your places (Home) - Use precise location - Learn more

Help    Send feedback    Privacy    Terms

*- 55 -*